# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

_____

In Re:

**CLAYTON H. WAGES and**
**ANDREA S. WAGES,**

              **Debtors.**

**Bankruptcy Case**
**No. 11-40249-JDP**

_____

# MEMORANDUM OF DECISION
_____

**Appearances:**

    Brent Robinson, ROBINSON, ANTHON & TRIBE, Rupert, Idaho,
Attorney for Debtor.

    Brian Langford, ROUTH CRABTREE OLSEN, P.S., Boise, Idaho,
Attorney for JPMorgan Chase Bank.

    Mary Kimmel, Boise, Idaho, Office of the U.S. Trustee.

MEMORANDUM OF DECISION - 1

*Introduction*

Chapter 11[1] debtors Clayton and Andrea Wages ("Debtors") reside

in a house situated on approximately 11 acres (the "Property") near

Heyburn.  They also use the Property in the operation of their trucking

business.  Debtors have proposed a chapter 11 plan in which they modify

the terms of a mortgage on the Property held by JPMorgan Chase Bank,

N.A. ("Creditor").  Creditor objects to confirmation of Debtors' plan,

asserting that, per §§ 1129(a)(1) and 1123(b)(5), Debtors may not modify

Creditor's contract rights because its claim is secured solely by an interest

in property that Debtors use as their principal residence.  Debtors, for their

part, argue that, because they also operate a business on the Property,

Creditor's claim is not secured by real property used solely as their

residence, and, therefore, § 1123(b)(5) is inapplicable.

After a June 12, 2012, hearing, the Court took Creditor's objection to

confirmation of Debtors' plan under advisement.  This Memorandum sets

---

[1] Unless otherwise indicated, all chapter and section references are to the
Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all rule references are to the
Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

MEMORANDUM OF DECISION - 2

forth the Court's findings of fact and conclusions of law concerning this
contest.  Rule 7052, 9014.

### *Facts*[2]

Debtors purchased the Property in 1999.  Initially, they used
approximately four acres for raising feed or crops, five acres for pasturing
livestock, and two acres for residential purposes.  At that time, Debtors'
employment consisted of raising roping stock on the Property to rent out
for rodeos and roping events.  About a year later, Debtors purchased a
truck to haul their livestock, and income from use of their truck became a
component of their business income.

Between 2004 and 2006, Debtors sold all of their livestock to raise
money to stave off a foreclosure against the Property.  Since then, Debtors
have not used the Property at all to generate income from livestock; they
allow a neighbor to pasture animals on the Property free of charge.

---

[2]  These facts are derived from the parties' submissions and Andrea
Wages' June 12 testimony.

MEMORANDUM OF DECISION - 3

At some time,[3] Debtors leased an additional truck and began hauling

commodities for others.  Their former livestock/trucking business became a

trucking-only business (the "Business").  Mr. Wages drives one of the

trucks; Mrs. Wages secures permits, keeps the books for the Business, and

handles other administrative chores from an office in Debtors' home.

When they are not being used on the road,[4] Debtors park the two trucks

and trailers[5] on the Property.  Also, when needed, Debtors repair the trucks

and trailers on the Property.  Thus, when Debtors filed their chapter 11

---

[3] The record is not clear as to exactly when Debtors transformed their business into a trucking-only operation.

[4] For example, Mr. Wages has been working a truck driving job in Nevada for the last ten months.

[5] Debtors' exhibits include an application for a U.S. DOT number indicating that Debtors owned a truck tractor, leased a truck tractor, and leased two trailers when applying for that number, which, as near as the Court can tell, was sometime prior to March of 2002.  Exh. 112.  When Debtors filed their schedules in the bankruptcy case in 2011, they indicated that they owned one truck tractor, a livestock trailer, and a flatbed trailer, and leased another trailer. Dkt. No. 20.  At the June 12 hearing, Debtors testified that a friend had given them another truck, and Debtors' exhibits include a picture of a truck tractor with "Leased To Wages Livestock" painted on the side above Debtors' U.S. DOT number.  Exh. 104.  It thus appears that the Business utilizes two truck tractors and up to three trailers.

MEMORANDUM OF DECISION - 4

bankruptcy petition on March 4, 2011, Debtors were using a portion of the

Property to operate the Business, including a small office in the house, and

enough adjoining space to park two truck tractors and up to three trailers.

In May 2011, Creditor filed a $127,418.31 secured claim in Debtors'

bankruptcy case based on a mortgage debt. Exh. 201. Per the mortgage

note's terms, Debtors agreed to make monthly payments through April 1,

2029, at an annual interest rate of 7.5%. *Id.* The debt was secured by a

mortgage on the Property. *Id.*

Debtors filed a chapter 11 plan in November 2011 (the "Plan"). Dkt.

No. 50. Under the Plan, Debtors propose to modify the terms of Creditor's

mortgage by reducing the interest rate to 5.0% per year, and extending the

payoff date to March 1, 2032. *Id.* Creditor objected to confirmation of the

Plan, arguing that it does not meet the confirmation requirements of

§§ 1129(a)(1) and 1123(b)(5). Debtors assert that they have met the Code's

confirmation requirements.[6]

---

[6] But for resolution of Creditor's objection, the Plan appears to satisfy all
other requirements for confirmation under § 1129(b).

MEMORANDUM OF DECISION - 5

### *Discussion of Applicable Law*

The Court may not confirm a chapter 11 plan unless it satisfies the Code's requirements.  In particular, Debtors must show that their plan "complies with the applicable provisions of this title."  § 1129(a)(1).[7] Among the Code's provisions applicable to chapter 11 plans is § 1123(b)(5), which provides that a plan may

> modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence,* or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

(emphasis added).  The upshot of this provision is that, if a creditor's claim is secured only by a security interest in real property that is the debtor's principal residence, the plan may not modify the creditor's rights. § 1123(b)(5).  The meaning of this provision is the focus of the parties'

---

[7] Section 1129(a)(1) provides:

> (a)  The court shall confirm a plan only if all of the following requirements are met:
>
> > (1)  The plan complies with the applicable provisions of this title.

MEMORANDUM OF DECISION - 6

arguments in this case.

In interpreting the Code, the Court first looks to the statute's plain meaning. *See Beach v. Bank of Am. (In re Beach)*, 447 B.R. 313, 321 (Bankr. D. Idaho 2011) (citing *Transwestern Pipeline Co., LLC v. 17.19 Acres of Prop. Located in Maricopa Cnty.*, 627 F.3d 1268, 1270 (9th Cir. 2010)). If the language at issue has a plain and unambiguous meaning, and the disposition required by the text is not absurd, the Court's inquiry ends. *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)). The Court must review the entire statute in context, not viewing individual words in isolation. *Reswick v. Reswick (In re Reswick)*, 446 B.R. 362, 370–71 (9th Cir. BAP 2011).

Here, looking at the Code as a whole, the phrase "'secured only by a security interest in real property that is the debtor's principal residence' modifies [the word] 'claim' and describes the type of claim that is excepted from modification." *BAC Home Loans Servicing, LP v. Abdelgadir (In re*

MEMORANDUM OF DECISION - 7

*Abdelgadir)*, 455 B.R. 896, 903 (9th Cir. BAP 2011).  As parsed by one bankruptcy court, the claims excepted from modification under § 1123(b)(5) are those (1) secured only by a parcel of real estate which (2) the debtor uses for his principal residence.  *In re Macaluso*, 254 B.R. 799, 800 (Bankr. W.D.N.Y. 2000) (finding the language of the Code's anti-modification provision[8] to be "[u]nambiguous and clear," and indicating that "the statute does not limit its application to property that is used *only* as a principal residence, but refers generally to any parcel of real property that the debtor uses for that purpose." (emphasis in original)).  In other words, the analysis to be employed by the Court to determine whether a claim is protected from plan modification under § 1123(b)(5) is clearly identified in the Code's plain language:  the bankruptcy court must first determine whether a claim is secured only by a parcel of real property; if it is, the court must then determine if that property is the debtor's principal

---

[8] Much of the case law construes the Code's chapter 13 anti-modification provision, § 1322(b)(2), and not § 1123(b)(5).  But, since those sections contain the same statutory language, the Court considers the decisions interpreting either provision as persuasive in interpreting the other.  *See, e.g.*, *Benafel v. One W. Bank, FSB (In re Benafel)*, 461 B.R. 581, 586–87 (9th Cir. BAP 2011).

MEMORANDUM OF DECISION - 8

residence; and, if it is, the debtor may not modify the claim secured by that property.

There is another view held by some courts about how to construe § 1123(b)(5), though. These courts focus on the particular words in the statute, and, in this Court's view, have seemingly convoluted the interpretation of the anti-modification provision. These courts deem the terms "real property" and "debtor's principal residence" to be coterminous, which, they argue, limits the provision's protection to those claims secured by property used *only* as a debtor's principal residence. *See, e.g.*, *Scarborough v. Chase Manhattan Mortg. Corp. (In re Scarborough)*, 461 F.3d 406, 411 (3d Cir. 2006) (focusing on Congress' use of the word "is" in the phrase "real property that is the debtor's principal residence," and finding that, by using "is," Congress equated "real property" and "principal residence," meaning that, for the anti-modification provision to apply, the property "must *be only* the debtor's principal residence" and have no other use (emphasis in original)); *Adebanjo v. Dime Sav. Bank of N.Y., FSB (In re Adebanjo)*, 165 B.R. 98, 103–04 (Bankr. D. Conn. 1994)

MEMORANDUM OF DECISION - 9

(same).

Despite these other decisions, the Court does not consider the different terms used in § 1123(b)(5) to be equivalent.  Under the Code, "debtor's principal residence":

> (A)  means a residential structure if used as the principal residence by the debtor, including incidental property, *without regard to whether that structure is attached to real property*; and
>
> (B)  includes an individual condominium or cooperative unit, a mobile or manufactured home, or trailer if used as the principal residence by the debtor.

§ 101(13A) (emphasis added).  This statutory definition, which refers to a "structure," regardless of the presence of, or the structure's attachment to, real property, obviously contemplates situations where a debtor's principal residence is not the equivalent of "real property."  *See id.*

In addition, a hyperliteral interpretation of § 1123(b)(5) equating "real property" with a "debtor's principal residence" could lead to absurd results when applied.  If the Code's anti-modification provision's protections extend solely to claims secured by the *structure* a debtor uses as

MEMORANDUM OF DECISION - 10

his or her principal residence (*i.e.*, the house), the provision would have no application to most residential mortgage loans, which are typically secured not only by a residential structure, but also by the real property on which the structure sits.  Of course, the Supreme Court has recently reminded bankruptcy courts to eschew hyperliteral translations of the Code when the process yields results contrary to common sense.  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, __ U.S. __, 132 S. Ct. 2065, 2068 (2012).

The Court concludes it a more sensible interpretation to extend the protections of § 1123(b)(5) to any loan secured only by real property that the debtor uses as a principal residence.[9]  While most courts reviewing the anti-modification provision have adopted this more reasonable interpretation, many have had difficulty applying the provision when a property has multiple uses.  In such cases, several courts, including some in the Ninth Circuit, have added non-textual requirements to the equation, finding that, if a property had "significant actual commercial use" or

---

[9] This reading is consistent with the plain and ordinary meaning of the phrase "real property that is the debtor's principal residence," and does not focus on individual words in isolation.

MEMORANDUM OF DECISION - 11

"inherent income producing potential," a claim secured by the property

may be modified.  *See In re McVay*, 150 B.R. 254, 256–57 (Bankr. D. Or.

1993).  *See also Lievsay v. W. Fin. Sav. Bank, F.S.B. (In re Lievsay)*, 199 B.R.

705, 709 (9th Cir. BAP 1996) (because the debtor did not show that a home

office added significant value to his property, or that the bank relied on the

additional security offered by his home office in making the loan secured

by the property,[10] the panel declined to decide whether the home office

provided additional security that would allow the debtor to modify his

loan); *In re Ramirez*, 62 B.R. 668, 669–70 (Bankr. S.D. 1986) (determining

that, because the debtor's property generated income as a rental property,

---

[10]  It is now questionable whether, in the Ninth Circuit, a lender's reliance
on any of a debtor's property as security at the time of making a loan should be
considered in interpreting the Code's anti-modification provisions.  The point at
which a property's use is assessed for purposes of applying the §§ 1123(b)(5) and
1322(b)(2) anti-modification provisions is the *petition date*, not the loan
origination date.  *See In re Abdelgadir*, 455 B.R. at 903 (finding that the petition
date is the appropriate time to determine a debtor's principal residence under
§ 1123(b)(5)); *and In re Benafel*, 461 B.R. at 588 (finding that, under § 1322(b)(2), the
petition date is when a debtor's principal residence is determined).  Whether the
creditor assumed that a loan would be secured by property that was used solely
as the debtor's principal residence at the inception of the transaction is, for
bankruptcy plan claim modification purposes, irrelevant.

MEMORANDUM OF DECISION - 12

in addition to being the debtor's residence, the mortgage on the property
was modifiable).

Inherent in this approach to construing the Code is the courts'
assumption that, at some point, for multi-use properties, the intensity of a
commercial use may somehow transition a property from the debtor's
principal residence, to something other than his or her principal residence.
The Code, however, explicitly provides modification protection to claims
secured only by an interest in real property that is the debtor's principal
residence.  § 1123(b)(5).  It does not protect from modification "claim[s]
secured only by a security interest in real property that is *exclusively* the
debtor's principal residence," or "claim[s] secured only by a security
interest in real property that is the debtor's principal residence, *unless the
debtor also uses the property for significant commercial purposes*."  Indeed, there
is nothing in the Code indicating that, once a commercial use of a property
becomes sufficiently "significant," that property ceases being the debtor's
principal residence.  Simply put, either a property is a debtor's principal
residence or it is not; the existence of other uses on the property does not

MEMORANDUM OF DECISION - 13

change that.  *See also In re Macaluso*, 254 B.R. at 800 ("So long as the only

collateral is a single parcel of real estate, it matters not that that parcel may

fulfill many uses or be divided into many units.  The statutory

requirements are fulfilled whenever the debtor principally resides in that

real estate or some part thereof.").

Additionally, relying on bankruptcy courts across the country to

make case-by-case determinations as to whether a particular mixed use

property crosses some undefined threshold from a "principal residence" to

some other type of use is likely unworkable.  The Code provides no

indication of where an appropriate line between "principal residence" and

"commercial activity" would be.  For example, in this case, would

Creditor's loan be protected from modification by § 1123(b)(5) if they

parked four trucks on the Property?;  five?;  if they used 23% of the

Property for commercial purposes, but not 24%?  Some decisions have

attempted to establish factors to identify when, for these purposes, a

property is no longer solely a debtor's principal residence.  *See, e.g., In re*

MEMORANDUM OF DECISION - 14

*Brunson*, 201 B.R. 351 (Bankr. W.D.N.Y. 1996) (developing a list of factors[11]

to use in case-by-case determinations of whether a property is commercial

or the debtor's principal residence).  Of course, the only standard identified

in the Code is whether the property is the debtor's principal residence.

Restricting the application of the Code's anti-modification provision to a

bright-line determination of whether, as a matter of fact, a claim is secured

---

[11]  *In re Brunson* suggests that, in each multi-use case, the bankruptcy court
should consider:

> whether the Debtor (to the lender's knowledge)
> owned other income producing properties or other
> properties in which she could choose to reside;
> whether she had a[nother] principal occupation . . . ,
> and the extent to which rental income or other
> business income produced from the real estate
> contributed to her income; whether her total income
> was particularly high or particularly low; whether the
> mortgage was handled through the commercial loan
> department or the residential mortgage loan
> department of the lender; whether the interest rates
> applied to the mortgage were home loan rates or
> commercial loan rates; the demographics of the
> market . . . ; and the extent to which , and purpose for
> which, potential business uses of the land (such as
> farming) were considered by the lender.  There surely
> may be others.

201 B.R. at 353.

MEMORANDUM OF DECISION - 15

by property used by a debtor as his principal residence provides the sort of

objective standard necessary for consistent judicial decisions and stable

credit markets.  As noted by one bankruptcy court:

> Markets work best when there are clear rules
> consistently applied.  Although investors
> certainly value fairness, they place an even higher
> value on certainty.  Investors can adjust for
> inequities.  It is much harder to adjust for
> uncertainty.  Deciding whether a particular
> mortgage falls within the home mortgage
> exception perhaps years after the fact on a case-
> by-case basis may ensure an equitable result for
> the particular debtor and lender involved.
> However, the home mortgage lending market as a
> whole pays a price for this result because of the
> considerable uncertainty such an approach lends
> to the underwriting decision when home loans
> are made.

*In re Bulson* , 327 B.R. 830, 842 (Bankr. W.D. Mich. 2005).  A clear

demarcation also allows chapter 11 debtors and their lawyers to more

clearly measure their ability to modify creditor rights even before filing for

bankruptcy, and certainly during the case in negotiating a plan.

Of course, there are some courts which, while recognizing the

importance of a bright-line standard, have attempted to place the line

MEMORANDUM OF DECISION - 16

elsewhere. In those cases, modification protection is denied whenever a debtor uses his property for something other than as his principal residence only. *See, e.g., In re Kimbell*, 247 B.R. 35, 37–38 (Bankr. W.D.N.Y. 2000). For several reasons, the Court is not persuaded.

First, the secondary use considered in those decisions has usually been multi-family housing, or, in other words, where a debtor attempts to modify the mortgage on a multi-unit dwelling while living in one of those units. *See, e.g., Lomas Mortg., Inc. v. Louis*, 82 F.3d 1 (1st Cir. 1996); *Ford Consumer Fin. Co., Inc. v. Maddaloni (In re Maddaloni)*, 225 B.R. 277 (D. Conn. 1998); *In re Kimbell*, 247 B.R. 35. Here, besides using the Property as their residence, Debtors use it for their trucking business. Clearly, the anti-modification provision's practical and policy considerations as applied to multi-family dwellings are not the same as those applicable to a trucking business.

Second, these courts rely primarily on policy grounds and legislative history, rather than conducting an analysis of the Code's language. *See, e.g., In re Kimbell*, 247 B.R. at 37–38; *In re Maddaloni*, 225 B.R. at 279–80. *See*

MEMORANDUM OF DECISION - 17

*also Lomas Mortg., Inc.*, 82 F.3d at 3–4 (comparing the two positions

presented by the parties and finding that, merely because the parties

disagreed as to the statute's meaning, the "plain meaning" approach must

be inconclusive and a resort to legislative history was required).  Here, the

Court concludes there is no need to resort to legislative history,

particularly not at the expense of the Code's language, because, in the

Court's opinion, the language of § 1123(b)(5) is plain and the disposition

required by the text is not absurd.  *See Milavetz, Gallop & Milavetz, P.A. v.*

*United States*, __ U.S. __, 130 S.Ct. 1324, 1332 n.3 (2010) (resort to legislative

history is unnecessary where a statute's language is unambiguous); *Lamie*,

540 U.S. at 534, 536.  A Code provision is not rendered ambiguous merely

because courts disagree as to its meaning.  *In re Reswick*, 446 B.R. at 370.

     To be sure, adoption of a bright-line rule could conceivably produce

anomalous results.  For example, the bankruptcy court in *In re Bulson*

observed that the interpretation adopted here by the Court would "allow[]

within its scope any integral plot of land, however described or platted,

upon which is situated any structure used by the debtor as his principal

MEMORANDUM OF DECISION - 18

residence.  The real property could be a city lot, three city lots, a quarter

acre suburban lot, a five acre suburban lot, or a 500-acre farm.  As for the

debtor's dwelling on the property, it could be a hut, an affixed mobile

home, a 10,000 square foot mansion, one room in a duplex, one apartment

in a 4-unit apartment, or one apartment in a 100-unit apartment.  How the

remaining property and the other structures located on the property were

being used or could be used would be irrelevant."  327 B.R. at 842–43.  But

the potential for harsh results can not be used as an excuse by the Court to

torture the Code's language to reach a different rule in this case.  Even if

the Court does not agree with all of the possible outcomes produced by the

statutory language, it is Congress, not this Court, that must repair any

problems with the Code.  *See Lamie*, 540 U.S. at 538, 541 ("Our

unwillingness to soften the import of Congress' chosen words even if we

believe the words lead to a harsh outcome is longstanding.  It results from

deference to the supremacy of the Legislature, as well as recognition that

Congressmen typically vote on the language of a bill. . . .  If Congress

enacted into law something different from what it intended, then it should

MEMORANDUM OF DECISION - 19

amend the statute to conform it to its intent.  It is beyond our province to

rescue Congress from its drafting errors, and to provide for what we might

think . . . is the preferred result." (internal quotations and citations

omitted)).

At the same time, this is not to say that the Court may *never* look

beyond § 1123(b)(5)'s plain language to review the impact of its legislative

history in all cases.  The Court simply refuses to do so until presented with

facts where the disposition required by the plain text is absurd.[12]  *See id.* at

534.  *But see, e.g., Lomas Mortg., Inc.*, 82 F.3d at 6 (looking beyond

§ 1123(b)(5)'s plain text on the basis of a mere hypothetical, and finding

that, whenever a non-principal-residence use occurs on property, a claim

may be modified because "[i]t is unlikely that Congress intended the

antimodification provision to reach a 100-unit apartment complex simply

_____

[12]  It is likely that several of the results identified by *In re Bulson*, 327, B.R. at 842–43, as falling within the scope of the plain reading adopted by the Court may be sufficiently absurd to require the Court to look beyond the statute's plain language if the text, as applied in a particular case, were to require such a disposition, *e.g.,* limiting modification where the property includes a residence on a large farm, or where the debtor's residence is one apartment in a 100-unit complex, etc.

MEMORANDUM OF DECISION - 20

because the debtor lives in one of the units."). While application of

§ 1123(b)(5), as construed by the Court here, may approach absurdity in a

case where the debtor's sole asset is a large farm property on which the

debtor resides, this is certainly not that case.

At bottom, whatever meaning the Court ascribes to § 1123(b)(5), the

resulting definition would, potentially, be both over-inclusive and under-

inclusive. *See In re Bulson*, 327 B.R. at 842–43 (identifying interpretations

that are the "limits for an almost limitless number of variations" of

potential interpretations of § 1123(b)(5)'s language). If the mortgage on

property where a debtor both conducts some business and lives can be

modified, the intent of Congress expressed in the Code will be

subordinated to an unpredictable "case-by-case" application of

§ 1123(b)(5). By the same token, a debtor who secures a loan with business

property, on which he also happens to reside when he or she files a chapter

11 bankruptcy petition to reorganize the business, will likely feel frustrated

by this Court's decision that the mortgage can not be restructured through

a plan. On the other hand, even applying this Court's construction of

MEMORANDUM OF DECISION - 21

§ 1123(b)(5), under *In re Abdelgadir*, the debtor has the option of relocating

his or her residence prior to filing the bankruptcy petition.[13]  *See* 455 B.R. at

903 (establishing the petition date as the appropriate time to determine a

debtor's principal residence under § 1123(b)(5)).

### *Disposition*

Because, in this case, the disposition required by the text of the Code

is not absurd, the Court is duty-bound to apply § 1123(b)(5) according to

its plain terms.  Here, the only security for Creditor's claim is the Property.

There is no dispute that Debtors live on the Property, and that it is their

principal residence.  That Debtors also operate a business on the Property

does not change that.  Creditor's mortgage terms may not be modified in

---

[13]  This option highlights the impact of Congress' decision to tie a debtor's right to modify the rights of mortgage creditors to those that hold "claims," as identified in *In re Abdelgadir*.  455 B.R. at 903.  In other words, a debtor may control his ability to modify a mortgage claim merely by how he or she uses the property when the status of claims in a bankruptcy case are determined, the petition date.  *Id.*  While this may prevent a debtor from modifying a claim that was made as a commercial loan if the debtor happens to live on the property on the petition date, it also allows a debtor to use § 1123(b)(5) to modify a residential mortgage claim as long as the debtor is not living on the property on the petition date, *e.g.*, if the debtor is renting the home to others, or is only operating a business from, and not living in, the home.

MEMORANDUM OF DECISION - 22

this case and preventing Debtors from modifying their mortgage under

§ 1123(b)(5) is not an absurd result.  The Court therefore concludes that

Debtors' Plan does not satisfy § 1129(a)(1) because it violates an applicable

provision of the Code, § 1123(b)(5).  As a result, the Plan can not be

confirmed.

## Conclusion

Creditor's objection to confirmation of Debtors' proposed chapter 11

plan is sustained.  A separate order denying confirmation of Debtors' plan

will be entered.

Dated:  July 24, 2012

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION - 23